UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

_____

QUANTUM SAIL DESIGN GROUP, LLC,

        Plaintiff,

v.                                                   Case No. 1:13-CV-879

JANNIE REUVERS SAILS, LTD,
LEADING EDGE SAILMAKERS, LTD,        HON. GORDON J. QUIST
SAIL DESIGN COMPANY, ULLMAN
SAILS, INTERNATIONAL, INC.,
and JANNIE REUVERS,

        Defendants.
_____/

**OPINION REGARDING DEFENDANT JRS' MOTION TO
NARROW ISSUES PURSUANT TO FEDERAL RULE 16(c)**

      Plaintiff, Quantum Sail Design Group, LLC (Quantum), sued Jannie Reuvers Sails, Ltd. (JRS) and other defendants alleging various claims based on Defendants' alleged unauthorized use of trade secrets and breaches of a 2009 International Affiliate Licensee Agreement (Licensee Agreement) and a 2009 Trade Secret License Agreement (Trade Secret Agreement) between Quantum and JRS. As a result of the Court's prior rulings and the parties' stipulations, JRS and Leading Edge Sailmakers, Ltd. are the only remaining Defendants in the case. Quantum's claims for trademark infringement, unfair competition, and/or false designation of origin alleged in Count IV, and its claims for statutory theft, embezzlement, and/or conversion alleged in Count V of its complaint, have previously been dismissed, leaving Quantum's claims for breach of the 2009 International Affiliate Licensee Agreement (Count I), breach of the 2009 Trade Secret License Agreement (Count II), and violation of the Michigan Uniform Trade Secrets Act (MUTSA) (Count III), M.C.L. § 445.1901, *et seq.* as the only remaining claims.

      JRS filed a motion early in the case to narrow issues pursuant to Federal Rule of Civil Procedure 16(c), seeking dismissal of Quantum's breach of Trade Secret Agreement claim and its

MUTSA claim. Pursuant to various Orders (dkt. ## 20, 49), the parties conducted discovery pertaining to the trade secret allegations prior to completing briefing on the motion. Following oral argument, the Court denied the portion of JRS's motion concerning the 2009 Trade Secret License Agreement claim and took the portion concerning the MUTSA claim under advisement (dkt. #129).

Having fully considered the parties' briefs, supporting materials, and oral arguments, and for the reasons set forth below, the Court will grant JRS's motion with regard to Quantum's MUTSA claim, but will order JRS cease using, and to return to Quantum, if it has not already done so, Quantum's build files.

## I. BACKGROUND

### A. The Parties

Quantum designs, manufactures, and sells, through a global distribution network, high performance sails used on top-of-the-line racing and cruising yachts. (Dkt. # 1 at Page ID##5–6.) Quantum sells various types of sails, including membrane sails. (*Id.* at Page ID#5.) JRS is a sailmaker with a facility located in South Africa. (*Id.* at Page ID##2, 7.) Quantum and JRS began their business relationship in approximately 1997. (*Id.*) JRS began producing membrane sails for Quantum in approximately 2007, after JRS signed an International Affiliate License Agreement dated January 1, 2005, and a Trade Secret License Agreement dated October 20, 2006. (*Id.* at Page ID#9.) JRS continued to produce membrane sails for Quantum until 2013, when it notified Quantum that it was terminating their relationship. (*Id.* at Page ID#16.)

### B. Development, Design and Manufacturing of Membrane Sails

Membrane or "string" sails are high-performance, lightweight sails used on both racing and luxury boats and yachts. (*Id.* at Page ID#5.) Essentially, these sails consist of sections of sail material, such as Mylar film, taped together to form a sail panel. Yarn or fibers are laid out in a

pattern on a bottom panel of sail material by a machine called a plotter, based on the load paths generated by the particular sail design. Glue holds the yarn in place on the bottom panel. (Dkt. # 53-4 at Page ID#1363.)[1] Another panel of the sail material is then laid on top of the bottom panel and the two panels are laminated to produce a membrane. (*Id.* at Page ID#1364.) Until 2006, the process of sandwiching string in a computer-designed layout between two panels of sail material to create membrane sails was subject to a United States patent. (Dkt. # 54-2 at Page ID##1389–1401; Dkt. # 54-3 at Page ID#1403.) Today, the process of manufacturing membrane sails is commonly known in the industry. Many sail-making companies manufacture and sell membrane sails and publish information and photos depicting their manufacturing processes. (Dkt. ## 52-2 to 53-2, Page ID##1265–1343.) In fact, Aeronaut Automation, a third-party supplier of software and equipment used in the manufacture of membrane sails, has published an article containing "a basic outline of the way membrane sails are manufactured for people who are interested in getting into membrane sail production." (Dkt. # 53-4 at Page ID#1363.)

Quantum's process of designing and manufacturing membrane sails involves three phases: design, manufacturing, and verification. (Dkt. # 1 at Page ID##21–26.) In the design stage, proprietary sail-design software is used to create the details of the membrane sail, including its shape and fiber layout, and to assess the impact of aerodynamic forces on the sail. (*Id.* at Page ID##21–23.) Once the design is completed, a computer-assisted design software package produces the layout of the sail panels and fiber loops, and the fibers are laid out by a plotter with a stringing head. (*Id.* at Page ID##24–26; Dkt. # 53-4 at Page ID#1363. ) Quantum uses a software package called "Tangent" in conjunction with its stringing plotter machine—both of which it purchased from Aeronaut—to lay out the fibers on the bottom panel. (Dkt. #53-3 at Page ID##1345–46.) The

---

[1] The parties filed their motions, briefs, and supporting materials under seal.

3

fibers enter the top of the plotter through a glue bath, are pulled through silicon nipples to strip the excess glue from the fibers, pass through a heated chamber, and are finally laid on the surface of the sail material by a stringing head. (*Id.* at Page ID##1347–1351, 1358.) Once the stringing is completed, another layer of sail material is placed on top of the fibers, and the air between the two layers is removed through a vacuum bagging process. The two layers are then laminated with a machine that uses heat in combination with pressure to fuse the layers together. (Dkt. # 1 at Page ID#25.) After the lamination is complete, the material is trimmed to size and finished into the final product. Quantum then tests or verifies its sails through its Quantum Racing TP52 program. (*Id.* at Page ID#26.)

C.   **Quantum's Development of its Membrane Sail Process**

Quantum was formed in 1996 by a group of independent sailmakers who sought to develop a leading membrane sail design and manufacturing company. (*Id.* at Page ID#7.) In the early 2000s, Quantum engaged Dr. Rob Razenbach, of the Engineering Research Center of the University of Maryland, to assist it in developing a computer aided design/engineering program to support Quantum research and development of a new continuous structural membrane sail. (Dkt. # 119-2.) In 2003, Quantum purchased an existing membrane sail manufacturing facility in Malaysia, but had difficulty manufacturing a satisfactory product for several years. In 2006, Quantum acquired a second membrane sail manufacturing facility, located in Palma, Spain. (Dkt. # 119-7.) In connection with the Spanish purchase, Quantum obtained the services of Jens Jacobsen, who had developed one of the leading membrane sails on the market, to serve as its Technical Director of Structural Technologies. (Dkt. # 119-5 at Page ID#2046; Dkt. # 119-7 at Page ID#2206.) In that role, Jacobsen had ultimate responsibility for the quality of the final membrane product. (*Id.* at Page ID#2211.) Even after Quantum retained Jacobsen, it continued to devote substantial resources to

4

refining its product and addressing quality control issues, such as sail de-lamination. (Dkt. # 119-5 at Page ID##2053, 16)

**D.      JRS and its Membrane Sail Manufacturing Process**

Prior to the time Quantum acquired the Palma facility, JRS produced cross-cut and tri-radial sails, but had no expertise or experience in producing membrane sails.[2] (Dkt. # 1 at Page ID#9.) To assist JRS in learning how to manufacture membrane sails, Quantum sent Jacobsen to JRS's facility in South Africa on two separate trips to correct production issues involving JRS's laminator, the thickness of the Mylar film that JRS was using, glue thickness, and imperfections in JRS's laminating floor. (Dkt. # 119-5 at Page ID##2081–82, 2091.) Jacobsen also advised JRS about what equipment to purchase and was involved in the installation of the equipment, which JRS purchased from Aeronaut, at JRS's facility. (*Id.* at Page ID#2103.) Jacobsen also provided JRS a Lamination Quick Guide, that included general rules of thumb for laminating, eight steps for ensuring proper operation of JRS's laminator, and curing instructions. (*Id.* at Page ID##2097–99.) In addition, in November 2006, JRS sent two employees to Quantum's Palma facility "to observe [Quantum's] in-house systems and the standards of production that are applicable throughout the Quantum Group worldwide." (*Id.* at Page ID#2107.)

## II.  Motion Standard

JRS brings its motion pursuant to Fed. R. Civ. P. 16(c), which, among other things, permits a district court to dismiss meritless claims before trial. Fed. R. Civ. P. 16(c)(2)(A). Although some district courts appear to recognize Rule 16 as a ground for bringing dispositive motions, *see, e.g.*, *Berg v. N.Y. Life Ins. Co.*, No. 11 C 7939, 2014 WL 3953833, at *1 (N.D. Ill. Aug. 12, 2014)

---

[2] Cross-cut and tri-radial sails are sails made from cloth. Cross-cut sails are constructed from panels of fabric with the seams between each panel oriented in a fore and aft direction. Tri-radial sails have panels that are oriented toward the corners of the sail. *See* http://www.fxsails.com/sailchoicearticle.php (last visited January 26, 2015).

5

("Resolution of issues as a matter of law, although neither expressly provided for under Rule 16 nor an appropriate subject for a motion for partial summary judgment under Rule 56, can play the role of a useful adjunct toward facilitating the disposition of a case."), such motions are uncommon in this district and the undersigned is unaware of any judge in this district who entertains dispositive motion practice under Rule 16, which lacks any sort of standard for resolving a merits-based motion. Therefore, this Court finds it more appropriate to apply the familiar summary judgment standard to the instant motion, particularly because the parties rely in large part on evidentiary matters outside of the pleadings in support of their respective positions.

Summary judgment is appropriate if there is no genuine issue as to any material fact and the moving party is entitled to a judgment as a matter of law. Fed. R. Civ. P. 56(c). Material facts are facts which are defined by substantive law and are necessary to apply the law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S. Ct. 2505, 2510 (1986). A dispute is genuine if a reasonable trier of fact could return judgment for the non-moving party. *Id.*

The court must draw all inferences in a light most favorable to the non-moving party, but may grant summary judgment when "'the record taken as a whole could not lead a rational trier of fact to find for the non-moving party.'" *Agristor Fin. Corp. v. Van Sickle*, 967 F.2d 233, 236 (6th Cir. 1992) (quoting *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S. Ct. 1348, 1356 (1986)).

### III. Discussion

The polices embodied in a claim for misappropriation of trade secrets include maintaining standards of commercial ethics and encouraging innovation. *Ford Motor Co. v. Lane*, 67 F. Supp. 2d 745, 749 (E.D. Mich. 1999). "The essence of the wrong is the breach of confidence, the betrayal

6

of the trust placed in the recipient." *Kubik, Inc. v. Hull*, 56 Mich. App. 335, 357, 224 N.W.2d 80, 92 (1974) (internal quotation marks omitted).

MUTSA provides a statutory cause of action and remedies for misappropriation of trade secrets. M.C.L. §§ 445.1903, 1904. The elements of a misappropriation claim are: (1) a trade secret; and (2) misappropriation. *Dice Corp. v. Bold Techs.*, 556 F. App'x 378, 385 (6th Cir. 2014). MUTSA defines "trade secret" as follows:

> (d) "Trade secret" means information, including a formula, pattern, compilation, program, device, method, technique, or process, that is both of the following:
>
> (*i*) Derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use.
>
> (*ii*) Is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

M.C.L. § 445.1902(d). Michigan courts have explained that a "'trade secret may consist of any formula, pattern, device or compilation of information which is used in one's business, and which gives him an opportunity to obtain an advantage over competitors who do not know or use it.'" *Hayes-Albion v. Kuberski*, 421 Mich. 170, 181, 364 N.W.2d 609, 614 (1984) (quoting Restatement of Torts § 757, cmt. b).

"[T]he essence of a trade secret is that it derives its value from secrecy." *Stromback v. New Line Cinema*, 384 F.3d 283, 305 (6th Cir. 2004). Generally, "[t]he law does not protect knowledge so general as to be common property in the trade, and there can be no legally recognizable trade secret in an idea that is well known or is easily ascertainable." *Insealator, Inc. v. Wallace*, 357 Mich. 233, 250, 98 N.W.2d 643, 653 (1959). In other words, novelty is essential to a trade secret. *Manos v. Melton*, 358 Mich. 500, 507, 100 N.W.2d 235, 238 (1960). Yet, "[n]ovelty, in the patent law sense, is not required for a trade secret. Quite clearly discovery is something less than

invention. However, some novelty will be required if merely because that which does not possess novelty is usually known; secrecy, in the context of trade secrets, thus implies at least minimal novelty." *Arco Indus. Corp. v. Chemcast Corp.*, 633 F.2d 435, 441–42 (6th Cir. 1980) (quoting *Kewanee Oil Co. v. Bicron Corp.*, 416 U.S. 470, 476, 94 S. Ct. 1879, 1883 (1974)) (internal citations and quotation marks omitted).

**A.**

The initial inquiry is whether Quantum has sufficiently identified its trade secret. "A party alleging trade secret misappropriation must particularize and identify the purported misappropriated trade secrets with specificity." *Dura Global Techs., Inc. v. Magna Donnelly Corp.*, 662 F. Supp.2d 855, 859 (E.D. Mich. 2009). This requirement enables the court and the parties to "separate the trade secret from matters of general knowledge in the trade or of special knowledge of persons skilled in the trade." *Dow Chem. Canada Inc. v. HRD Corp.*, 909 F. Supp. 2d 340, 346 (D. Del. 2012) (citing *Imex Corp. v. Cinema Techs., Inc.*, 152 F.3d 1161, 1164 (9th Cir. 1998)).

Quantum alleges that its trade secret is "a process for producing/designing composite structural sail cloth." (Dkt. # 1 at Page ID#19.) The complaint indicates that this process covers not only the manufacturing and lamination process, but also sail designs created by Quantum's proprietary design software, as well as Quantum's sail verification program. At oral argument, Quantum's counsel admitted that JRS no longer has access to its design files, but noted that Quantum has proof that JRS downloaded many of Quantum's so-called "build files," allowing JRS to manufacture any of the sails disclosed in those files. JRS's counsel represented that JRS no longer possesses such files because JRS gave Quantum a hard drive containing the build files after this litigation commenced. Whether JRS still possesses Quantum's build files may or may not be an open issue, but in any event the Court finds no reason to believe, and JRS does not appear to

8

dispute, that Quantum's build files are trade secrets. Accordingly, at the least, Quantum is entitled to an order directing JRS to cease all use of such files and return them to Quantum, if it has not already done so.

It appears that the only remaining portion of Quantum's process in dispute is the manufacturing/lamination portion, as Quantum has not indicated that it is claiming any trade secret in its validation program.

**B.**

Michigan courts have identified certain factors that are relevant in determining whether an idea or information constitutes a trade secret. Those factors include:

> (1) The amount of labor and money expended. Those factors rather than brilliance of conception or execution determine whether an idea or information is worthy of court protection.
>
> (2) The idea should be embodied or be capable of being embodied in concrete form to be protectible as a trade secret.
>
> (3) Trivial advances or differences in formulas or process operation are not protectible as trade secrets.
>
> (4) The plaintiff must prove that he was in possession of the alleged trade secret at the time defendant is alleged to have obtained it from plaintiff or one of his employees.
>
> (5) Where the alleged trade secret was known to the recipient prior to its disclosure to him, the recipient is free to use it.
>
> (6) A trade secret may not be protected if it is known generally to the trade although not known to the recipient.
>
> (7) Plaintiff must prove that secrecy has been maintained either by non-disclosure of [sic] disclosure in confidence.

*Manos*, 358 Mich. at 508, 100 N.W.2d at 238–39 (quoting *Ellis on Trade Secrets* § 239, at 324–35); *see also Hayes-Albion*, 421 Mich. at 182, 364 N.W.2d at 614 (listing the following factors from the Restatement but noting that they are not comprehensive: "(1) the extent to which the information

9

is known outside of [the owner's] business; (2) the extent to which it is known by employees and others involved in [the owner's] business; (3) the extent of measures taken by [the owner] to guard the secrecy of the information; (4) the value of the information to [the owner] and to his competitors; (5) the amount of effort of (sic) money expended by him in developing the information; (6) the ease or difficulty with which the information could be properly acquired or duplicated by others").

Quantum has shown that it spent a significant amount of money, and devoted a substantial amount of time and effort, in developing and perfecting its membrane lamination process. Quantum has shown—and JRS does not dispute—that no employee or representative of JRS had any experience or knowledge about the process or technique for manufacturing membrane sails prior to the time Quantum disclosed its asserted trade secrets to JRS. Finally Quantum has presented evidence to show that it made reasonable efforts to maintain secrecy. M.C.L. § M.C.L. 445.1902(d). That is, Quantum required JRS to sign a Trade Secret Agreement in 2006, and also required JRS's employees to sign individual Confidentiality Agreements in 2011. (Dkt. # 119-14.) Quantum also required its potential and actual contractors to sign Confidentiality Agreements.[3] (Dkt. # 119-15.)[4]

JRS's primary attack on Quantum's asserted trade secret, however, is that the process for producing membrane sails is so well known and widely used in the sail-making industry, and information about the process is so easily obtained, that Quantum's process cannot possibly be considered a trade secret. JRS notes that many companies produce laminate membrane sails using

---

[3] JRS did not argue in its opening brief that Quantum failed to maintain sufficient measures to protect the secrecy of its information. In its reply, however, JRS argued, in a footnote, that Quantum failed to maintain secrecy because Jens Jacobsen's consulting agreement did not contain a non-disclosure, confidentiality, or similar agreement with Quantum. The Court need not consider this argument because JRS waived it. *See Sanborn v. Parker*, 629 F. 3d 554, 579 (6th Cir. 2010) ("We have consistently held . . . that arguments made to us for the first time in a reply brief are waived.").

[4] Factors pertaining to concrete embodiment and possession of the trade secret are not in dispute. Membrane sails are a concrete embodiment and there is no question that Quantum was in possession of the information alleged to be a trade secret at the time it was disclosed to JRS. In any event, these factors do not substantially affect the Court's analysis.

the same process and equipment that Quantum uses and that the required equipment and supplies may be readily obtained from third-party vendors. JRS supports these assertions with publicly-available literature and video clips discussing and illustrating the membrane sail manufacturing process. In particular, JRS has presented evidence showing that:

- Quantum's stringing equipment, including the glue pot, blowers (thermal tunnels), and stringing head, is all available from Aeronaut and is commonly used by other membrane sail manufacturers. Quantum and JRS both purchased this equipment from Aeronaut. (Dkt. #51 at Page ID#1254; Dkt. ## 56-3, 56-5, 57-1.)

- Anyone who seeks to enter the membrane sail business can obtain a significant amount of information about the process and equipment by reading Aeronaut's brochure.

- Quantum's use of a vacuum to remove trapped air between the sheets of membrane excess adhesive, in combination with heat and pressure from a laminator, is not a secret because it is described in a 2010 article published in a publication called *Australian Sailing*, is shown in use in a video clip by Doyle Sails, a Quantum competitor, and is discussed and shown in Aeronaut's brochure. (Dkt. # 53-4 at Page ID#1375; Dkt. # 57-4 at Page ID# 1496; Dkt. # 55-2 at Page ID#1448.)

- An article from the October/November 2013 edition of *Professional BoatBuilder* titled, "Economies of Sail," shows a laminator used by China Sail Factory—a Quantum Sail competitor—containing the same elements as Quantum's laminator. (Dkt. # 55-1 at Page ID#1433.)

Quantum acknowledges that elements of its manufacturing process are known or used by other manufacturers, but it argues that the total process that it uses is not generally known by its competitors. For example, it notes that Kevin Sproul, who has substantial experience in the membrane sail industry as an employee and owner of Sobstad Sailmakers and as Managing Director for Elvstrom Sailmakers, testified that he would expect a membrane manufacturer to use either a vacuum system or heat and pressure for the final lamination process, but not both: "I wouldn't expect people to do both. Either the vacuum system, if it's a proper vacuum, would actually do the whole lamination. . . . The other way is the sail is put down on the floor, a layer of film is laid on

11

top of it and then a roller goes over the top and applies pressure and temperature to laminate the sails together." (Dkt. # 119-9 at Page ID#2309.) Mr. Sproul also testified that he has never been involved with a manufacturer that uses a floor-based laminator. (*Id.* at Page ID#2310.) Similarly, Duncan Skinner of Elvstrom said that Elvstrom does not use a laminator. (Dkt. # 119-11 at Page ID#2354.) Quantum also argues that there is more to the membrane manufacturing process than the equipment and a rudimentary knowledge of how the process works. Yannick Richomme, who is in charge of Incidences' technology, said that "producing membrane is not . . . a simple process. It's a very proprietary process." (Dkt. #119-10 at Page ID#2333.) Mr. Richomme also said that membrane manufacturing involves a lot of trade secrets, including the type of glue, the diameter of the fibers and the way they are laid down, the type and thickness of the film, the choice of a vacuum process or pressure for lamination, and use of a curing time. (*Id.* at Page ID##2334–35.) Mr. Richomme also believed that Quantum's process of using a vacuum prior to lamination is not standard in the industry, and he confirmed that Incidences's laminator does not have air skates. (*Id.* at Page ID##2345–46.) Finally, Quantum points out that the Aeronaut brochure that serves as the principal basis for JRS's argument states, "For reasons of commercial confidentiality, we cannot talk about customer's (sic) manufacturing process in detail." (Dkt. # 54-4 at page ID#1363.)

"To be a trade secret, the information must, of necessity, be a secret." *Kubik, Inc.*, 56 Mich. App. at 347, 224 N.W.2d at 87. Trade secrets do not "encompass information which is readily ascertainable, i.e., capable of being acquired by competitors or the general public without undue difficulty or hardship." *Id.* at 348, 224 N.W.2d at 87; *see also* M.C.L.A. § 445.1902(d)(*I*) (defining trade secret as information that is not "readily ascertainable by proper means"). On the other hand, "information may qualify as a trade secret although others possess it. The extent to which information is known by outsiders is but one factor to be considered in determining whether the information is a trade secret." *Hayes-Albion*, 421 Mich. at 185, 364 N.W.2d at 616. Even if all of

12

the information contained in a trade secret can be obtained through investigation and research of publicly-available information, such does not negate the secrecy of such information if a party acquires the secret information through unfair or improper means. *See Kubik, Inc.*, 56 Mich. App. at 352, 224 N.W.2d at 89.

Although Quantum's competitors probably do not know all of the details of Quantum's process for manufacturing membrane sails, the basic process is well known in the industry and is easily discoverable, even by persons outside the industry, by viewing the wealth of materials available online depicting and explaining the process. As JRS has demonstrated, this process is shown in videos and in online materials that Quantum's competitors have made available to the public. These materials depict, essentially, what Quantum does: use an automated stringing machine to lay fibers with glue applied to them onto sail material, which is then laminated by one of several methods. The Aeronaut brochure provides an even more detailed description of the process for anyone interested in getting into the business, and the information it contains describes the process that Quantum claims as its trade secret. The facts that Mr. Sproul was not aware that some manufacturers laminate with both vacuum and heat and pressure, and neither Mr. Sproul nor Mr. Richomme has used a floor laminator does not mean that such information cannot be readily obtained with minimal investigation or effort. As noted, Quantum's lamination method of combining a vacuum with heat and pressure is mentioned in an article on membrane sails in a 2010 publication, as well as in the Aeronaut brochure, and a video clip shows a Quantum competitor using the same process. Similarly, a 2013 industry publication shows a Quantum competitor—China Sail Factory—using a floor laminator containing the same elements as Quantum's laminator, and the Aeronaut article shows a similar floor laminator. This evidence indicates that Quantum's process is not a trade secret.

JRS has also shown that the equipment and software that Quantum uses for its lamination process, with the possible exception of its laminator, may be purchased directly from Aeronaut. In fact, JRS's evidence shows that the equipment that Quantum uses—its glue pot, blowers, and stringing head and rollers—is standard in the industry. This evidence also indicates that Quantum's process is not a secret. *See Sulfo Techs., LLC v. Schmoyer*, No. 294246, 2011 WL 445808, at *8 (Mich. Ct. App. Feb. 8, 2011) (per curiam) (rejecting the plaintiff's contention that its process was a trade secret because "[a]ll of the equipment used by both Sulfo and SAT was readily available in the public domain, advertised by the individual vendors, and was not demonstrated to have been built to any unusual specifications").

Quantum argues that the Court's focus must be on Quantum's entire *process*, rather than on its separate components. The case Quantum relies on, however, the Sixth Circuit's decision in *Mike's Train House, Inc. v. Lionel, L.L.C.*, 472 F.3d 398 (6th Cir. 2006), actually said that a "unified process, design [or] operation" may constitute a protectible trade secret if it comprises a "unique combination." *Id.* at 410–11 (quoting *3M v. Pribyl*, 259 F.3d 587, 595–96 (7th Cir. 2001)). Quantum has failed to demonstrate that its process differs in any material respect from that of other membrane sail manufacturers such that it constitutes a "unique combination." In this Court's judgment, *Arco Industries Corp. v. Chemcast Corp.*, 633 F.2d 435 (6th Cir. 1980), is more on point. There, the plaintiff claimed that its approach and layout for producing grommets was a trade secret. The plaintiff failed to introduce any evidence that any of the items in its manufacturing process was novel or secret. The court observed, "[c]ertainly it is possible that a new combination of known steps or processes can be entitled to trade secret protection," but the plaintiff "failed to show specifically what it claimed as its protectable layout and approach." *Id.* at 442. "The evidence at trial showed unequivocally that the type of conveyor, mold, injector, pump, oven, and elastomeric material used by Arco, and its method of rejecting the finished grommet from the mold, were

14

commonly known in the trade. Arco never isolated any aspect of its 'layout' which is secret or in any way novel." *Id.* The same can be said of Quantum in the instant case.

Quantum also suggests that temperature adjustments that it made to its glue, its choice of laminating materials or fibers, and cure times constitute trade secrets. However, these adjustments are more properly considered "mere variations on widely used processes [that] cannot be trade secrets." *Menzies Aviation (USA), Inc. v. Wilcox*, 978 F. Supp. 2d 983, 995 (D. Minn. 2013) (internal quotation marks omitted). In other words, Quantum's adjustments are tweaks to a well-known standardized process. Such "[p]roprietary ways of doing the same thing that others in the same field do are not trade secrets." *Agency Solutions.Com, LLC v. TriZetto Grp. , Inc.*, 819 F. Supp. 2d 1001, 1017 (E.D. Cal. 2011). Furthermore, JRS has shown that some of Quantum's adjustments have more to do with environmental conditions than with any secret process.

Quantum also contends that its lamination process deserves trade secret protection because it affords Quantum a competitive advantage over its competitors—production of a superior product. The Court does not doubt that Quantum produces membrane sails that are superior to those produced by many of its competitors, although Quantum's own evidence indicates that manufacturers North Sails, Doyle, and Elvstrom produce sails that are on par with Quantum's. (Dkt. # 119-10 at Page ID#2328.) Nonetheless, Quantum has failed to identify what, in particular, about its manufacturing process constitutes a trade secret that affords it a competitive advantage. The Court repeatedly raised the issue at oral argument, but Quantum's counsel failed to adequately answer the question, and instead argued that there are multiple decision points that occur during the manufacturing process. However, outside of counsel's argument, Quantum has never claimed that its trade secret resides in a particular, identifiable set of manufacturing decisions.

It appears to the undersigned that the root of Quantum's advantage lies not in a protectible trade secret, but in the expertise gained from experience needed to build a top quality membrane

15

sail, which Quantum's personnel possess. This experience and expertise cannot be protected as a trade secret. *See Follmer, Rudzewicz & Co. P.C. v. Kosco*, 420 Mich. 394, 402, 362 N.W.2d 676, 680 (stating that "an employee is entitled to the unrestricted use of general information acquired during the course of his employment or information generally known in the trade or readily ascertainable" (footnote omitted)); *Strategic Directions Grp., Inc. v. Bristol-Myers Squibb Co.*, 293 F.3d 1062, 1065 (8th Cir. 2002) (noting that "the law of trade secrets will not protect talent or expertise, only secret information" (internal quotation marks and brackets omitted)). In fact, Quantum's own witnesses indicate that the key to manufacturing a quality membrane sail lies not in a trade secret, but in the knowledge and skill of the sailmaker. For example, Mr. Sproul testified that he stopped purchasing membrane sails from Elvstrom Sails in Palma after Mr. Jacobsen left because "when he left, it was very difficult to get a decent product from them . . . He was a key part of why we were buying product from them in the first place." (Dkt. #119-9 at Page ID##2287–88.) Similarly, Richard Franks, formerly with Hyde Sails, indicated that Hyde Sails decided not to use sails from a certain company that moved its manufacturing facility from Australia to the Philippines because "they lost some of their technical guys and then the product fell off the table quality-wise and it couldn't produce and so we didn't use them in the end." (Dkt. # 119-12 at Page ID##2366–67.)

    Accordingly, for the foregoing reasons, the Court concludes that Quantum does not possess a trade secret entitled to protection.

## C.

    Alternatively, JRS contends that Quantum's MUTSA claim fails because even if Quantum has a trade secret, Quantum cannot prove that JRS used it. JRS asserts that Quantum has no evidence that JRS is using its "nipples" to strip excess glue from fibers, that JRS is using its glue

bath, that JRS is using Quantum's stringing head design to lay string, or that JRS is using the same laminator or temperature or speed settings.

Quantum has failed to respond to JRS's lack of use argument. Because the Court finds no readily-apparent basis for rejecting JRS's argument or evidence on this issue, the Court concludes that JRS has adequately demonstrated that even if Quantum has a trade secret, JRS is not using it.

### IV. CONCLUSION

For the foregoing reasons, the Court will grant JRS's motion to narrow the issues and dismiss Count III with prejudice.

An Order consistent with this Opinion will enter.


Dated: January 29, 2015            /s/ Gordon J. Quist
                                   GORDON J. QUIST
                                   UNITED STATES DISTRICT JUDGE