UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

_____

QUANTUM SAIL DESIGN GROUP, LLC,

        Plaintiff,

v.                              Case No. 1:13-CV-879

JANNIE REUVERS SAILS, LTD, and        HON. GORDON J. QUIST
LEADING EDGE SAILMAKERS, LTD,

        Defendants.

_____/

### OPINION REGARDING (1) CROSS-MOTIONS FOR
### SUMMARY JUDGMENT; (2) PLAINTIFF'S MOTION FOR
### SANCTIONS; AND (3) PLAINTIFF'S MOTION FOR LEAVE TO AMEND

Plaintiff, Quantum Sail Design Group, LLC (Quantum), and Jannie Reuvers Sails, Ltd.

(JRS)—a South African sailmaker—partnered for approximately sixteen years to manufacture and

sell under the Quantum name high-end, custom-made, membrane sails used by top racing yachts and

other sailing vessels. The relationship soured, eventually terminated, and Quantum filed the instant

lawsuit alleging several claims, including breach of the parties' 2009 International Affiliates License

Agreement (IALA) (Count I) and 2009 Trade Secret License Agreement (TSLA) (Count II). JRS

responded with a number of counterclaims. Following a series of stipulations by the parties and

rulings by this Court, Quantum was left with only the breach of the IALA and TSLA claims and

only JRS and Leading Edge Sailmakers (LES) as Defendants. Eventually, the Court entered a

stipulated order appointing a Special Master. Following an in-depth review, the Master issued his

Report on or about January 30, 2017.

It had been anticipated that the Master's Report might resolve the case, but that did not

occur. Instead, the parties filed cross-motions for summary judgment based on the Report. In

addition, Quantum filed a motion for sanctions essentially renewing its previous motion for sanctions, and a motion for leave to amend its complaint to add various individuals and entities as alter-egos of JRS.

The Court heard oral argument on the motions on January 22, 2018, during which it indicated some rulings and took other issues under advisement. For the following reasons, the Court will grant Quantum's motion for summary judgment in part and deny it in part, and deny JRS's motion for summary judgment. In connection with those rulings, and based on the Master's Report, the Court concludes that Quantum is entitled to summary judgment as to JRS's liability for breach of the 2009 IALA and TSLA. However, because the Court has questions about certain conclusions in the Master's Report, it will refer the matter back to the Master for clarification of these issues and defer a ruling on damages pending a response from the Master. As for the remaining motions, the Court will grant Quantum's motion for sanctions in part and deny its motion to amend.

## I. BACKGROUND

### A.    The Parties' Relationship and 2009 IALA

Quantum and JRS (through its owner Jannie Reuvers) began doing business together in 1995, when Quantum was located in Maryland. JRS manufactured sails for Quantum at JRS's shop in Cape Town, South Africa, and paid Quantum a royalty. By 1998, JRS had become Quantum's exclusive sail manufacturer, but the parties did not have a formal written agreement. Prior to the first IALA in 2005, JRS paid Quantum a 3% royalty for sails it sold bearing the Quantum logo. Quantum and JRS collaborated on pricing to allow Quantum a reasonable mark-up on sales.

In 2005, the parties entered the first IALA, which contained many of the same provisions as the 2009 IALA (discussed below). Unlike the 2009 IALA, however, the 2005 IALA was only a license for the distribution and sale of sails to the public; JRS was authorized to continue

manufacturing, delivering, and selling sails to JRS's present OEM (original equipment manufacturer) customers outside of JRS's local marketing area and to solicit and sell sails outside of its local marketing area, provided that JRS would only make sales within another licensee's local marketing area pursuant to an agreement with the other licensee. (ECF No. 214-2 at PageID.9663.) Under the 2005 IALA, Quantum affiliates (end customers) could place orders directly with JRS. JRS paid Quantum royalties of 1.5% for OEM sales and 5% for membrane sales. (*Id.* at PageID.9685; Master's Report (MR) ¶ 5.2.5.1.)

In 2008–09, Quantum decided to change its business model. The change called for increased rates globally for Quantum-branded products and implementation of a centralized order and accounting system. Under this new system, all transactions would be handled through Quantum's global order system (GOS). Manufacturers were precluded from making direct sales outside their sales territories to Quantum affiliates and customers; instead, the affiliate or customer would place the order directly with Quantum, and Quantum would handle the pricing and payments for such sales and control the placement of the order with the manufacturer. (ECF No. 214-3 at PageID.9699.) Quantum would make such sales at its wholesale cost, which Quantum and the manufacturer would mutually determine, plus a percentage markup to be determined and retained by Quantum, in lieu of a royalty from the manufacturer. (*Id.*) Quantum was required to deposit 50% of the order price with the manufacturer prior to production, and to pay the balance within thirty days of shipment by the manufacturer. (*Id.*) The manufacturer was still permitted to make sales and provide pricing directly to customers located within its sales territory, but was required to submit an order form for such sales on the GOS. (*Id.* at PageID.9699–700.) For such in-territory sales, the manufacturer was required to pay Quantum a royalty of 8% on all sales pre-approved by Quantum as OEM or fleet sales and 15% for all other sales. (*Id.*)

Quantum and JRS entered into the 2009 IALA on or about January 19, 2009. However, problems with the new system soon arose, primarily because none of the affiliates (Quantum's end customers) had signed the 2009 IALA (and apparently the new arrangement had not been communicated to the affiliates), and Quantum lacked a fully-operational accounting system to handle the new ordering procedures. The first affiliate did not sign the new IALA until July 8, 2009, and the last affiliate signed on February 3, 2010. (MR ¶¶ 5.2.6.2, 5.2.6.3.) During the first two months of the agreement, Quantum did not issue invoices to JRS, and JRS did not receive payment from Quantum. (MR ¶ 5.2.7.1.) On February 27, 2009, Quantum sent an email to JRS stating that it would take time to "sort [the affiliates'] contracts out" and that "the pricing stays as is until they sign new contracts." (MR ¶ 5.2.6.1.) On April 3, 2009, Quantum issued a unilateral interim policy proposal which waived the restrictions on manufacturers dealing directly with affiliates and customers and made JRS responsible for invoicing and collecting funds. In other words, JRS was required to invoice and collect its wholesale price, plus the Quantum mark-up. (MR ¶ 5.2.7.4.)

On April 7, 2009, Craig Middleton of JRS emailed Quantum regarding the interim proposal noting that, although it referred to a price list, no copy of a price list was included. Middleton also indicated that JRS would be meeting with its bankers to determine whether the proposed arrangement would comply with South African law. (MR ¶ 5.2.7.6.) Because of South Africa's laws governing the outflow of monies from that country to other countries, manufacturing agreements such as the 2005 and 2009 IALAs must be submitted and approved by the South African Department of Trade & Industry (DTI) and the South African Reserve Bank (SARB). On April 29, 2009, Belinda Reuvers advised Quantum that before its proposed arrangement could be approved by the DTI and SARB, JRS needed to submit a signed copy of the 2009 IALA to the DTI and the SARB. She also stated, "[a]t the moment, you [sic] e-mail re account of International Affiliate

orders through South Africa is contrary to DTI & SARB ruling." (MR ¶¶ 5.2.8.1, 5.3.8.2.) On May 1, 2009, the DTI informed JRS that a Certificate of Approval was denied because the IALA was a manufacturing agreement and the 15% royalty exceeded the "maximum permissible being 6% of the net ex-factory selling price" and the TSLA, being a technology agreement, must be based on actual performance. (MR ¶ 5.2.8.5; ECF No. 191-2 at PageID.4747.) The DTI said that "[t]hese should be renegotiated and royalties should not be paid out on the strength of these agreements." (*Id.*)

On October 23, 2009, JRS received a legal opinion from its attorneys that the 2009 IALA "structure, as currently conducted, is unlawful and constitutes a breach of various legislation enacted." (MR ¶ 5.2.8.16; ECF No. 191-2 at PageID.4753.) Subsequently, Belinda Reuvers notified Quantum that the procedure set forth in paragraph 6(i) of the 2009 IALA should be followed. (MR ¶ 5.2.8.17.) Although Quantum requested clarification of the issue, and the parties continued to attempt to resolve it, including through amendments to the IALA, the issue was never resolved, and the parties continued their practice of setting off accounts payable against accounts receivable, at least through 2012, when Quantum finally had its accounting system in place. In addition, JRS never received a Certificate of Approval from SARB and DTI.

## B.  The Master's Report

The Stipulated Order defined the Master's engagement as follows:

Perform an accounting and prepare a written report with recommended findings of facts (the "Report") on two issues: (i) royalties [JRS] owes [QSDG], if any, under the [QSDG] International Affiliates License Agreement (Dkt. 1 Ex. A); and (ii) the amount [QSDG] owes JRS, if any, based on the allegations in Count I of JRS's Counter-Complaint (Dkt. 42 at p. 79, *et seq.*).

(ECF No. 169 at PageID.3077.) On October 27, 2015, Quantum filed a motion for sanctions. Quantum argued that sanctions were appropriate because JRS, through Jannie Reuvers, submitted

a false affidavit in this case representing that LES had not conducted business since 2004 and operated wholly independent of JRS, and JRS fabricated invoices for sales to Quantum's Norwegian affiliate and others, which, for example, altered the customer name or product that was actually sold. Following a hearing on the motion, the Court entered an Order Amending the Stipulated Order, which provided:

> The Master shall have the authority to review and consider invoices and other documents obtained from Plaintiff's Norwegian affiliate evidencing sales between the Norwegian affiliate, Quantum Norway, and Defendant Leading Edge Sailmakers and/or Defendant Jannie Reuvers Sails (JRS) and/or anyone acting in concert with either or both of them, to determine whether Defendant JRS: (a) properly produced all records pertaining to royalties owed Plaintiff under the 2009 License Agreement; and (b) submitted false invoices to the Master for purposes for the accounting. The Master may consider such documents for any other purpose the Master deems necessary to completion of a fully-informed accounting.

(ECF No. 188 at PageID.4219.) In addition, the Order created a presumption: if the Master determined that JRS failed to produce all records or submitted false compilations, the Master was to presume that JRS engaged in a similar pattern or practice with regard to all of its other customers without requiring such proof from Quantum. JRS could rebut the presumption by producing evidence that its records for any given customer were true and accurate. (*Id.* at PageID.4220.)

The Master issued his Report on or about January 30, 2017. The Report is 141 pages long, includes numerous appendices and exhibits, and details that JRS provided two royalty schedules, one in October 2015, and another one in April 2016. The Master found, among other things, that:

- JRS's 2015 royalty schedule is permeated with false information based on false invoices. (MR ¶ 6.7.1.)
- The April 2016 royalty schedule volunteered by JRS contains a sanitised version of the 2015 royalty schedule in that the false information had been rectified. (MR ¶ 6.7.2.)
- The scanning exercise conducted on behalf of Quantum was prematurely terminated and would have uncovered the full extent of concealment of transactions and falsifications of documents instead of a limited number of fake documents having to be relied upon in the sanctions application. (MR ¶ 6.7.3.)

- In spite of the false October 2015 compilation, "JRS and its local counsel have co-operated with the Master satisfactorily throughout the course of this investigation." (MR ¶ 6.7.4.)
- [I]t is concluded that a pattern of concealment was established on the part of JRS and/or Belinda and Jannie Reuvers and we conclude that JRS has not rebutted the presumption. (MR ¶ 6.8.1.)
- JRS owes Quantum as royalties under the 2009 IALA $1,119,815.25. Quantum owes JRS the following amounts: (1) $580,228.55 for balance on open trade account; (2) $215,000 for refund of trade secret license fees; and (3) $119,000 for refund of design fees. (MR ¶¶ 6.9.1, 6.9.2.)
- That the measure for loss of profits/damages to Quantum be fixed at 22.5%, as this appears to be the measure of losses set forth in Quantum's sanctions brief. (MR ¶ 6.10.2.)
- That the highest level for Quantum's potential damages is USD 2,287,128.92. (MR ¶ 6.10.3.)

Regarding the fabricated LE invoices, the Master noted:

> With the advent of Pricer 4 and the introduction of the new [Quantum] 30% mark-up, Belinda Reuvers was dissatisfied with the prospect of having to invoice at the mark-up prices since JRS had already taken a number of orders for sails at the old prices months before the increase. Consequently she decided not only that she was going to assist Wind Design, who she knew had already sold the product ordered from JRS to its clients at the old prices, but was [sic] also felt compelled to hide the transactions from [Quantum] so that Wind Design could afford to pay them for the sails ordered. . . . On October 11, 2016 we conducted a final interview with Belinda and Jannie Reuvers. They admitted to us that, as matters progressed over the years, one of the main reasons for fabricating invoices was to hide transactions from [Quantum]. They asserted that they had been highly frustrated by constant emotionally charged arguments, heated complaints and badgering, telephonically and otherwise, on the part of Ed Reynolds . . . .

(MR ¶¶ 5.15.4, 5.15.8.)

The meat of the Report, which sets forth the analysis on damages and royalties, is set forth on pages 128–131. Pages 130–31 contain charts showing the calculations under various scenarios. The chart set forth in ¶ 5.17.5 includes lost profits calculations for Quantum based on a 22.5% and a 35% profit margin, or mark-up.

On April 27, 2017, the Court entered an Order directing the parties to file briefs regarding the Report if they could not settle the case. (ECF No. 198). In response, Quantum filed a motion

for summary judgment requesting that the Court adopt the Report, with certain specified modifications, grant Quantum summary judgment, and enter judgment for it in the amount of $3,619,749 on all remaining claims and counterclaims. As noted above, Quantum also filed a motion to amend the pleadings and for sanctions. Defendants did not initially file a motion, but instead filed a brief regarding the Report and the procedure for moving forward. Subsequently, Defendants filed their own motion for summary judgment.

## II. DISCUSSION

### A. Quantum's Requests for Modification

Quantum requests that the Court modify the Master's Report as to several issues. Pursuant to Federal Rule of Civil Procedure 53(f), a court must decide de novo all objections to a master's findings of fact, unless the parties stipulate for clear error review or that the master's findings will be final. Fed. R. Civ. P. 53(f)(3). Here, the Stipulated Order says that "the Master's findings shall not be final and this Court shall only apply a *de novo* standard of review." (ECF No. 169 at PageID.3080.) In addition, a court must decide all objections to legal conclusions as a matter of law. Fed. R. Civ. P. 53(f)(4). A court "may adopt or affirm, modify, wholly or partly reject or reverse, or resubmit to the master with instructions." Fed. R. Civ. P. 53(f)(1).

Quantum requests the following modifications:

1.  Correct ¶ 5.13.2 regarding Evolution Sails Australia having an IALA agreement with Quantum because Quantum never had an agreement with Evolution Sails Australia.[1]

2.  Correct or amend ¶ 5.2.7.4 to indicate that the interim policy still required all International Affiliates to order all South African sails through Quantum's General Order System(GOS).

---

[1] Quantum identified this request as its second request in its brief. The Court was unable to locate the first request.

8

3.      Correct the statement in ¶ 5.2.10.3 that JRS drafted a document purporting to terminate the relationship and forwarded it to Quantum. Quantum has no record of ever receiving a draft termination document from JRS and requests that the Court modify this paragraph to note that JRS produced no evidence substantiating that it forwarded the document to Quantum.

4.      Strike ¶¶ 5.17.3, 5.17.4, 5.18.1.12, and 6.9.1., because the Master exceeded his mandate by recommending which scenario—8% versus 15% royalty and 22.5% versus 35% margin for lost profits—is appropriate. Quantum also takes issue with the statement in ¶ 6.10.2 that 22.5% appears to be the measure of damages Quantum set forth in its prior brief in support of its motion for sanctions. Quantum says that the Master incorrectly described its proposed rate in its sanction motion, which was a blended rate of between 25% and 36 % depending on the year. Quantum requests that this paragraph be stricken.

5.      Strike or amend a number of paragraphs pertaining to JRS's counterclaim for trade secret license fees and design fees be stricken and/or modified, including ¶¶ 5.7.4, 5.7.5–5.7.11, 5.17.1, 5.17.5, 5.18.11, and 6.9.2. In particular, Quantum notes that only Count I of JRS's counterclaim was included within the scope of the Stipulated Order and, therefore, the Master improperly considered JRS's claims for trade secret license fees. Quantum further notes that the counter complaint does not include a claim for refund of design fees.

Defendants failed to provide specific responses to Quantum's requested modifications and amendments.[2] Regardless, the Court has reviewed the paragraphs as to which Quantum seeks modification or amendment and concludes that Quantum's requests are proper. Therefore, the Court will modify the Report accordingly.

## B.      Cross-Motions on Quantum's Breach of 2009 IALA and TSLA Claims

### 1.      Defendants' Arguments Regarding Non-Enforceability

Defendants raise several arguments in their response to Quantum's motion for summary judgment and in their own motion for summary judgment as to why Quantum cannot enforce the 2009 IALA and/or TSLA. These arguments fail for the following reasons.

---

[2]The Court notes that Defendants suggest that the Court refer the Report back to the Master to resolve Quantum's objections. Because it is the Court's responsibility to address objections in the first instance, Defendants' failure to provide specific responses to Quantum's requested modifications provides the Court no basis to conclude that further analysis by the Master on these issues is necessary.

### First Material Breach

Defendants argue that Quantum cannot sue for breach of the agreements because it committed the first material breach. This is basically a rule of substantial completion. "The rule in Michigan is that one who first breaches a contract cannot maintain an action against the other contracting party for his subsequent breach or failure to perform."[3] *Michaels v. Amway Corp.*, 206 Mich. App. 644, 650, 522 N.W.2d 703, 706 (1994) (internal quotation marks omitted). The rule applies only when the initial breach is substantial. *Id.* at 650, 622 N.W.2d at 707. Defendants argue that Quantum breached the agreements by failing to comply with pricing and warranty terms, failing to satisfy the condition precedent of bringing its account with JRS current, and by depositing 50% of certain orders into JRS's account prior to JRS commencing production. However, "[a] party may waive the other's breach, i.e., overlook it and continue performing under the contract." *Stanwood Motor Sports Acquisition, LLC v. Arnold*, Nos. 313994, 314018, 2014 WL 1515373, at *5 (Mich. Ct. App. Apr. 17, 2014). "'A waiver implies an intention to overlook a deficiency, or to forego a right to have the defect remedied or to have compensation therefor, and necessarily implies knowledge of the defect that is waived, or acquiescence under circumstances reasonably implying unconditional acceptance . . . .'" *Id.* (quoting *Eaton v. Gladwell*, 108 Mich. 678, 680–81, 66 N.W. 598, 599 (1896)).

As the Report lays out, to the extent Quantum materially breached either agreement, it remedied such breaches by making payments to JRS and taking other actions. More importantly, JRS waived any such breaches by continuing to perform as if both agreements were in place. It is undisputed that JRS continued to deal with Quantum and obtain the benefits conferred by the

---

[3]The 2009 IALA and TSLA both specify that they are governed by Michigan law.

agreements, and thus acquiesced to any changes in the methods of payment or accounting. JRS was free to stop dealing with Quantum at any time, but elected not to do so.

### *Impossibility or Impracticability/Frustration of Purpose*

Defendants next argue that the doctrine of impossibility and/or impracticability extinguished JRS's liability under the 2009 IALA and TSLA. The rule of impossibility provides that "'when, due to circumstances beyond the control of the parties the performance of a contract is rendered impossible, the party failing to perform is exonerated." *Bissell v. L.W. Edison Co.*, 9 Mich. App. 276, 284, 156 N.W.2d 623, 626 (1967) (quoting *Whelan v. Griffith Consumers Co.*, 170 A.2d 229, 230 (D.C. 1961)). Impossibility encompasses impracticability. *Id.* at 285, 156 N.W.2d at 626. "Although absolute impossibility is not required, there must be a showing of 'impracticability because of extreme and unreasonable difficulty, expense, injury or loss involved.'" *Roberts v. Farmers Ins. Exch.*, 275 Mich. App. 58, 74, 737 N.W.2d 332, 342 (2007) (quoting *Bissell*, 9 Mich. App. at 285, 156 N.W.2d at 626). "The impracticability defense applies only if an unanticipated circumstance has made performance of the promise vitally different from what should reasonably have been within the contemplation of both parties when they entered into the contract." *Hemlock Semiconductor Operations, LLC v. SolarWorld Indus. Sachsen GmbH*, 867 F.3d 692, 702 (6th Cir. 2017) (internal quotation marks omitted).

Defendants argue that JRS's performance became impracticable after the contracts were signed. Defendants note that Quantum had not signed agreements with its affiliates and lacked the proper accounting system to accommodate the new method of placing orders, and was well aware of these circumstances. Defendants further note that these circumstances led Quantum to adopt the interim policy requiring JRS to invoice the affiliates directly and collect from them the wholesale price plus Quantum's markup. Defendants argue that the lack of approval from the South African

11

authorities rendered the modification to the IALA illegal and constituted an unanticipated circumstance that rendered JRS's performance vitally different than what the parties had contemplated when they entered into the 2009 IALA.

Quantum responds that Defendants fail to show that the interim policy rendered JRS's performance either impossible or impracticable. Quantum notes that, in spite of Defendants' arguments, the Master concluded that JRS (with LES's participation) breached both agreements by selling directly to third parties, including Evolution Sails and Technique Voile (to whom JRS was prohibited from selling), by depriving Quantum of its mark-up to affiliates, and by under-reporting royalties to Quantum. Quantum argues that nothing prevented Defendants from complying with the agreements in some circumstances and breaching them in others, and Defendants did not require approval from the South African government to refrain from selling to third parties. Regarding Defendants' claim that the agreements were illegal because the South African authorities did not approve them, Quantum cites *Oilwell (Pty) Ltd. v. Protec International Ltd.*, No. 295/10 (S. Afr. 2011)—a case from the South Africa Supreme Court of Appeal—for the proposition that a debtor may not avoid its contractual obligations based on noncompliance with South Africa's Exchange Control Regulations.

Defendants fail to sustain their defense of impossibility/impracticability. Defendants' course of performance shows that JRS's performance was not rendered impracticable "because of extreme and unreasonable difficulty, expense, injury or loss involved." *Bissell*, 9 Mich. App. at 285, 156 N.W.2d at 626. JRS chose to abide by the agreements in some instances, but not in others. Thus, JRS was not prevented from performing. As for Defendants' illegality argument, the *Oilwell* court stated:

> [I]t is necessary to reiterate that the object of the Regulations in general is to regulate and control foreign currency and the object of reg 10(1)(c) in particular is "to control

12

> foreign exchange in the public interest and to prevent the loss of foreign currency resources through the transfer abroad of capital assets held in South Africa." The Regulations are, accordingly, for the public interest and not to protect any private interest. They were adopted for the sake of The Treasury and not for the sake of disgruntled or disaffected parties to a contract. This is apparent from the penalty provision. . . .

*Id.* at ¶ 24 (footnote omitted). It is true, as Defendants note in their reply, that the *Oilwell* court cautioned that "[t]his does not mean that in the absence of Treasury consent the transaction is enforceable without more," because parties to a contract that may be controlled by the Regulations may be obliged to take necessary steps to obtain Treasury's consent. *Id.* at ¶ 25. Still, the court did not say that lack of Treasury consent is a bar to enforcement either, observing that because "[t]here is nothing preventing The Treasury from consenting to a transaction *ex post facto*, . . . the transaction absent consent is not void at the behest or election of one of the parties to it." *Id.* Instead, the court identified a procedure a defendant may follow in a case involving a covered transaction—"a dilatory plea pending the determination by The Treasury of its application for the necessary consent." If consent is denied, the defendant may defend the claim on that ground. *Id.* In the Court's judgment, lack of consent is not a defense in the instant case because Defendants have not made a "dilatory plea"[4] to submit the matter to the South African Treasury for a determination. *Oilwell* may well provide Defendants a defense in the event Quantum seeks to enforce this Court's judgment in South Africa.[5]

Defendants also raise the defense of frustration of purpose. "Frustration of purpose and impracticability are overlapping defenses." *Hemlock Semiconductor Operations*, 867 F.3d at 705

---

[4]A dilatory plea is "[a] plea that does not challenge the merits of a case but that seeks to delay or defeat the action on procedural grounds." *Black's Law Dictionary* (10th ed. 2014). As applicable here, a dilatory plea would include a plea in abatement, or suspension of the action. *Id.*

[5]The parties dispute whether JRS concealed the South African regulators' actual concern, i.e., the royalty rate or the collection system implemented under Quantum's interim policy, from Quantum. The Court finds it unnecessary to resolve this issue.

(internal quotation marks omitted). The defense requires not only an unforeseen event, but that "the unforseen event thwart[ed] the parties' purpose in making the contract to such a degree that 'one party's performance [becomes] virtually worthless to the other.'" *Id.* (quoting *Liggett Rest. Grp., Inc. v. City of Pontiac*, 260 Mich. App. 127, 134, 676 N.W.2d 633, 637 (2000)) (second alteration in original). Defendants' argument regarding frustration of purpose is the same as their impracticability argument—that Quantum's interim policy changed the structure of transactions under the 2009 IALA and subjected it to South African monetary policy regulations. As noted above, however, the changes implemented by the interim policy did not frustrate either party's purpose in entering the agreements; neither party's performance was rendered worthless, as both continued to do business and profited from their relationship. Whether the lack of South African Treasury consent frustrates the purpose of the agreements is a matter that remains to be seen if Defendants avail themselves of the procedure set forth in *Oilwell*.

### Public Policy

Defendants argue that the 2009 IALA and TSLA are void as against Michigan's public policy because requiring JRS to pay additional royalties to Quantum would violate South African law. Under Michigan law, "the courts are to enforce the agreement as written absent some highly unusual circumstance, such as a contract in violation of law or public policy." *Wilkie v. Auto-Owners Ins. Co.*, 469 Mich. 41, 51, 664 N.W.2d 776, 782 (2003). "Contracts which violate a statute are contrary to public policy and cannot be enforced by the courts, even though actual injury does not result from the agreement." *Peeples v. City of Detroit*, 99 Mich. App. 285, 302, 297 N.W.2d 839, 846 (1980) (on rehr'g). However, a distinction is made between contracts that are *void ab initio* and those that are merely voidable. "[A] void contract exhibits a symmetrical unenforceability; both parties are equally denied the authority to enforce." *Epps v. 4 Quarters Restoration, LLC*, 498 Mich.

518, 548,  872 N.W.2d 412, 427 (2015).  On the other hand, "[a] voidable contract . . . exhibits a distinctive one-sided enforceability"—"the party with the power of avoidance has the unilateral option to either rescind the contract and avoid the obligation of performance, or to ratify the contract and render it enforceable."  *Id.*

Defendants' public policy argument fails because the 2009 IALA and TSLA violate neither Michigan statute nor public policy.  Moreover, the agreements are not void under South African law.  The Master said in his Report that the agreements are only voidable, not void *ab initio*, under South African law.  (MR ¶ 5.2.10.6.)   The court's statement in *Oilwell* that a "transaction absent consent is not void at the behest or election of one of the parties to it," *Oilwell* at ¶ 25, casts doubt as to whether a lack of consent renders the agreements even *voidable*.  In short, Defendants fail to show that the agreements contravene public policy.

### *Expired Term*

Defendants next argue that even if the 2009 IALA were valid, it expired in 2011 because the parties did not renew it.  The 2009 IALA had a term of two years and provided for an additional one-year renewal term upon the occurrence of certain events.  (ECF No. 12-13 at PageID.623–24.) Defendants argue that the agreement terminated in 2011, upon expiration of the two-year term, and the parties did not take the steps required for renewal.

Although the stated initial term expired without either party taking the required steps to affect a renewal as specified in the agreement, the parties continued to operate under an implied agreement on the terms and conditions provided in the 2009 IALA.  In *Cloverdale Equipment Co. v. Manitowac Engineering Co.*, No. 97-1664, 1998 WL 385906 (6th Cir. July 1, 1998), the parties entered into a series of six written one-year distributorship agreements, the last of which expired on June 12, 1995.  Following the expiration, the parties continued their business relationship in the

same manner as before. As for the parties' contractual relationship, the Sixth Circuit affirmed the district court's conclusion that the parties' conduct following the expiration of the contractual term demonstrated that the parties entered into a one-year implied-in-fact contract that "incorporat[ed] the same material terms as the parties' six express contracts." *Id.* at *3. The court observed that "the parties' course of dealing prior to June 12, 1995 and their course of performance after that date point to the existence of a one-year implied contract governed by the same terms as their earlier written agreements." *Id.*

The same is true here. For example, the Master's Report shows that JRS paid royalties to Quantum prior to February 2011, through a reduction in Quantum's open account, and JRS continued to pay royalties to Quantum using the same procedure through May of 2013. (MR, Annexure A.) JRS also continued to sell to Quantum affiliates with authorization from Quantum, by entering transactions in the GOS and collecting Quantum's markup (which was offset by a reduction in the open account) (*Id.*, Annexure M.) In addition, JRS continued to sell to Quantum affiliates and third parties—as it had done during the agreement's express two-year term—without authorization from Quantum and without posting the transactions on the GOS. (*Id.*, Annexure B.) Although Defendants argue that the parties' relationship both during the two-year term of the 2009 IALA and thereafter was "fraught with intense uncertainty," such did not prevent JRS from operating under the terms of the agreement both during its term and thereafter. Accordingly, the parties continued their established course of dealing through June of 2013.

### 2. Quantum's Motion for Summary Judgment

#### *JRS's Liability*

The Master found, and it is undisputed, that JRS (itself and through LES) breached the 2009 IALA in several ways. First, contrary to the agreement, JRS made sales to third parties, such as

Evolution Sails and Technique Voile, to whom JRS was not allowed to sell. Second, JRS under-reported royalties on sales it was authorized to make under both the 2009 IALA and the TSLA. Third, JRS deprived Quantum of mark-ups of sales made to Quantum's affiliates, which were not reported to Quantum. Finally, JRS violated the IALA by failing to submit all orders on the GOS. JRS disguised many of these transactions through fabricated invoices issued to fictitious customers.

### Quantum's Damages and JRS's Offsets

In Michigan, "[t]he general rule is that a remedy for breach of contract should make the nonbreaching party whole or 'place the nonbreaching party in as good a position as if the contract had been fully performed.'" *Roberts*, 275 Mich. App. at 69, 737 N.W.2d at 340 (quoting *Corl v. Huron Castings, Inc.*, 450 Mich. 620, 625–26, 544 N.W.2d 278, 280 (1996)). As set forth above, Quantum's damages are as follows: (1) for sales that JRS made, itself or through LES, within JRS's sales territory, a royalty of either 8% or 15% on the gross sales price of each transaction, depending on whether the sale was on a transaction pre-approved as an OEM or fleet sale; (2) Quantum's mark-up for sales that JRS made, itself or through LES, outside its sales territory directly to third parties; and (3) the mark-up on sales JRS, itself or through LES, made to Quantum affiliates. In other words, if a sale was made within JRS's sales territory, it is subject to a royalty of either 8% or 15%. Quantum is entitled to its mark-up on all other sales.

As noted above, paragraph 5.17.5 of the Report sets out a chart replicating the contends of a spreadsheet showing alternative scenarios—royalties due from JRS to Quantum calculated at both 8% and 15% and damages and based on Quantum's lost mark-up calculated at both 22.5% and 35%. To the extent Defendants object to the Master's inclusion of calculations of damages based on Quantum's lost mark-ups as beyond the scope of the September 4, 2015, Stipulated Order appointing the Master, the objection is overruled. While it is true that the Stipulated Order confined the Master

to determining "royalties" that JRS owes to Quantum, subsequent discoveries, as set forth in Quantum's sanctions motion and described in the Report, rendered such analysis proper, particularly in light of the existing scope of the Master's engagement.

The parties' respective positions in their briefs (and as stated at oral argument) reflect differing interpretations of the Master's conclusions. Quantum argues that its damages total at least $3,619,749, consisting of damages of $3,056,787 and attorney fees and costs of $562,962, which were beyond the scope of the Master's engagement. The non-attorney-fees-damages portion of Quantum's figure consists of $2,287,129 in lost profits calculated at 22.5% and $1,685,566 in royalties calculated at 15%, less $915,908. The first two figures appear in column 3 of paragraph 5.17.5, while the last figure comes from paragraph 5.18.1.9 and is for funds "JRS collected as mark-up from [Quantum] affiliates in their behalf." On the other hand, Defendants suggest that, assuming Quantum is entitled to a damages rate of 22.5% on the LE invoices, total royalties and damages would be $671,893.90, determined by adding royalties on the CT and Durban invoices, damages at 22.5% on the LE series of invoices, and royalties on cash sales ($526,992.45, $2,287,128.92, and $21,278.83) and subtracting royalties paid by JRS, the balance owing by Quantum on its trade account with JRS, trade secret and design fees (from JRS's counterclaims), and the credit for mark-ups from paragraph 5.18.1.9 ($333,591.03, $580,228.55, $334,000, and $915,908).

Although the Court still has some unresolved questions about the Report (discussed below) that it will refer back to the Master, some conclusions can be reached. First, on Quantum's side of the ledger:

- Neither party takes issue with the Master's determination that JRS owes Quantum $526,992.4 on the CT and Durban invoices or that JRS owes Quantum $21,278.83 in royalties for cash sales.

- As for the LE invoices, the Court concludes that, with the exception of the TUI Marine sales (which the parties agree are at an 8% royalty), Quantum is entitled to

a royalty of 15%, rather than 8%. Pursuant to the 2009 IALA, sales were subject to an 8% royalty only with Quantum's prior approval of the order as an OEM or fleet sale. Because Quantum apparently did not pre-approve the transactions subject to royalties as OEM or fleet sales, such transactions are subject to a 15% royalty.

Second, on Defendants' side of the ledger:

- Neither party disputes the Master's conclusion that JRS is entitled to credit for payment of royalties in the amount of $333,591.03.

- Neither party disputes that Quantum owes JRS $580,228.55 on the open trade account.

- JRS is not entitled to credit of $334,000 for trade secret license and design fees as those issues were outside the scope of the Master's engagement.

Two issues remain unclear, at least to the Court. First, Defendants argue that the Master's calculations in paragraph 5.17.5 essentially double count the LE invoices by first calculating a royalty on the LE series of invoices and then adding additional damages based on either a 22.5% or a 35% rate. In Defendants' view, "[t]he 22.5% and 35% figures are just an extension of the 8% and 15% calculations." (ECF No. 207 at PageID.9338.) The Court's math does not quite bear this out: based on the Court's calculations, the implied sales subject to royalties are $11,314,187 ($905,135/.08; $1,697,128/.15), while the implied lost sales subject to damages are $10,165,018 ($2,287129/.225) and $10,575,437 ($3,701,403/.35). In any event, in the Court's judgment, Defendants' point does call into question whether the calculations in paragraph 5.17.5 impose both a royalty calculation and a lost profits calculation on the same transactions evidence by LE invoices. The second issue calling for clarity is the $915,908 the Master identifies in paragraph 5.18.1.9 as mark-ups that JRS collected on behalf of Quantum. In paragraph 5.18.1.12, the Master states, "As regards alleged damages for loss of profits, it is evident that an amount of USD 915 908.00 constituting the sum total of JRS's collection of the 22.5% mark-ups ought to be deducted from the amount of USD 2 287 128.92." In their briefs, both parties subtracted the $915,908 in accordance

with the Master's Report. However, at oral argument, Quantum's counsel questioned why the $915,908 should be deducted because JRS collected that amount and footnote 208 of the Report suggests that JRS recorded that amount on its books. In other words, as the Court understands it, Quantum believes that JRS already deducted the $915,908 from amounts it owes Quantum.

In sum, subject to additional information from the Master, Quantum's damages will be calculated as follows: (1) add royalty liability for CT and Durban invoices of $526,992.45, royalty liability for LE invoices at 15%, with adjustment of $226,241.82 for TUI Marine, damages/loss of profits on LE series invoices at 22.5% (Quantum has accepted the 22% rate), and royalties on cash sales of $21,278.83; and (2) subtract royalties paid by JRS in the amount of $333,591.03 and balance Quantum owes JRS on trade account in the amount of $580,228.55 (and, depending on the Master's clarification, $915,908). As for attorney fees, Quantum supports its request for fees in the amount of $562,962 with copies of bills from its primary firm in this case, its South African counsel, and a summary of payments to the Master. An award of fees and related expenses appears proper under paragraph 17A of the 2009 IALA, and Defendants did not specifically object to Quantum's request or the amount Quantum requests.

### JRS's Counterclaims

Quantum also seeks summary judgment on JRS's counterclaims I, II, and IV–VII, which include account stated (Count I), common law conversion (Count II), declaratory relief (Count IV), breach of contract (Count V), action on price (Count VI), and tortious interference with contracts and commercial expectancies (Count VII).

With regard to Count I, the parties agree that JRS is entitled to summary judgment on this counterclaim in the amount of $580,228.55—the amount the Master determined as Quantum's outstanding trade account balance with JRS. In light of this result, the parties agree that JRS's

counterclaims for common law conversion and action on price should be dismissed.

As for Counts IV, V, and VII for declaratory relief, breach of contract, and tortious interference, the Court concludes that Quantum has failed to properly support its request for summary judgment on those counterclaims. Quantum may file a separate motion on those counterclaims if it believes that a proper basis exists for dismissal and/or summary judgment.

## C. Quantum's Motion to Amend

Quantum moves for leave to file an amended complaint adding the following parties as alter egos of JRS: Jannie Reuvers, Belinda Reuvers, Platinum Mile Investments 517 (Pty) Ltd., Burlywood Investments 20 CC, and the J & B Trust. The Court will deny this motion. As the Court indicated during oral argument, in the event Quantum seeks to enforce a judgment from this Court against JRS in South Africa, it may seek the same relief before the South African court against the alleged alter egos of JRS.

## D. Quantum's Motion for Sanctions

Quantum renews its prior motion for sanctions, requesting that the Court sanction Jannie and Belinda Reuvers pursuant to its inherent authority for their misconduct during this litigation. In particular, Quantum argues that Defendants submitted a false affidavit and included false information in several filings with the Court; submitted false documents to the Master and lied to him; and withheld true copies of documents and instead produced fabricated invoices. Consequently, Quantum requests that the Court order that: (1) the Reuvers be held personally liable for attorney fees, copying costs, and the costs associated with the Master's investigation (a total of $300,000) that Quantum incurred since discovery on damages began in this case; (2) immediately release the escrow funds held in the Court's registry; and (3) issue an injunction barring Defendants from manufacturing any membrane sails for a period of 2 years.

Defendants argue that Quantum is merely seeking a second bite at the apple on its prior motion for sanctions, which the Court dismissed as moot. (ECF No. 188.) Defendants further note that they did not engage in discovery fraud, as the fake invoices with fictitious customer names were created before the litigation began. Defendants also argue that they did not try to hide the fake invoices from Quantum or the Master, as Quantum and/or the Master would have discovered them in the ordinary course regardless. Defendants also argue that Quantum caused much of the delay and any additional expense by filing its previous motion for sanctions. Finally, Defendants argue that they did not cause Quantum to incur additional discovery costs because Quantum was always going to incur such costs.

Quantum replies that, at the hearing on Quantum's previous motion for sanctions, the Court said that sanctions would be appropriate, not for discovery violations, but if Defendants in fact maintained false records. Quantum further points out that Defendants failed to address most of the points Quantum raised in its brief regarding the Master's findings indicating that Defendants lied to the Court and the Master. Finally, citing emails between its counsel and Defendants' prior counsel, Quantum notes that neither it nor the Master would have eventually discovered the "real" invoices absent Quantum's sanction motion.

A district court has inherent authority to award sanctions when a party litigates in bad faith or commits a fraud on the court. *See First Bank of Marietta v. Hartford Underwriters Ins. Co.*, 307 F.3d 501, 512–16 (6th Cir. 2002) (citing *Chambers v. NASCO, Inc.*, 501 U.S. 32, 50, 111 S. Ct. 2123, 2135–36 (1991)). In *First Bank of Marietta*, the Sixth Circuit noted that a district court may invoke its inherent authority to impose sanctions for bad-faith conduct, even if the district court failed to consider whether sanctions may be appropriate under any rules or statutes. In spite of Defendants' arguments, the conduct in this case, from an objective standpoint, cannot be viewed as

anything other than bad faith. Defendants gloss over the fact that they (including Jannie and Belinda Reuvers) made false statements or misrepresentations of fact to this Court. For example, in their brief in support of their motion to dismiss for lack of personal jurisdiction, Defendants stated that "there has been no trading through [LES] since February 2004," (ECF No. 35 at PageID.918), when that was clearly not the case. Moreover, it is not a foregone conclusion, as Defendants assert, that Quantum or the Master would have inevitably discovered the fake invoices. In fact, it was only after Quantum filed its sanctions motion that Belinda Reuvers corrected the 2015 royalty schedule by removing false information. (MR ¶ 6.7.2 ("The April 2016 royalty schedule volunteered by JRS contains a sanitised version of the 2015 royalty schedule in that the false information has been rectified.").) Moreover, JRS was not forthcoming with the Master regarding sales to Technique Voile and Evolution Sails.

Accordingly, the Court concludes that sanctions are appropriate. As the Court indicated at oral argument, it declines to issue the injunctive relief that Quantum requests. The Court does conclude that the funds held in escrow in the Court's registry should be released to Quantum. With regard to an award of fees and costs, the Court finds such an award appropriate. Quantum requests "attorney fees, copying costs, and the costs associated with the Master's investigation incurred by Plaintiff since the discovery on damages begun in this case in the amount of $300,000." ECF No. 206 at PageID.9317.) This request presents two issues. First, it is not clear whether the amount requested is duplicative of the fees Quantum requests as part of its damages. Second, Quantum did not provide an affidavit and documentation to support its request. Therefore, the Court will order Quantum to clarify whether its requested fees and costs are separate from those claimed as damages and, if not, to provide supporting documentation. Finally, given that the misconduct was perpetrated by the Reuvers, the monetary sanction portion, if any, will be imposed against them as well as JRS.

### III. CONCLUSION

In sum, the Court will grant Quantum's motion for summary judgment in part and deny it in part. The Court will grant the motion with respect to JRS's liability for damages under the 2009 IALA and the 2009 TSLA, and will reserve its ruling on damages pending receipt of additional information from the Master. The Court will also grant the motion with regard to Counts II and VI of JRS's counter-complaint and deny it with regard to all other Counts subject to Quantum's motion. JRS will be granted summary judgment on Count I of its counter-complaint. The Court will also grant Quantum's motion for sanctions and deny Quantum's motion to amend. Finally, the Court will deny Defendants' motion for summary judgment.

A separate Order will enter.


Dated:  April 10, 2018                                    _____/s/ Gordon J. Quist_____
                                                                          GORDON J. QUIST
                                                                          UNITED STATES DISTRICT JUDGE